**FILED**

**DECEMBER 7, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**07 C 6912**

|  |  |  |
|---|---|---|
| _____ | ) | |
| CONTINENTAL CASUALTY COMPANY and | ) | |
| CONTINENTAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| COMMERCIAL RISK RE-INSURANCE COMPANY, | ) | |
| COMMERCIAL RISK REINSURANCE COMPANY | ) | **JUDGE LEINENWEBER** |
| LIMITED, GENERAL SECURITY INDEMNITY | ) | **MAGISTRATE JUDGE KEYS** |
| COMPANY OF ARIZONA, GENERAL SECURITY | ) | |
| NATIONAL INSURANCE COMPANY, GIE | ) | |
| COLUMBUS, SCOR, and SCOR REINSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs Continental Casualty Company and Continental Insurance Company

(collectively, "Plaintiffs" or "CNA") state the following for their Complaint against defendants,

Commercial Risk Re-Insurance Company, Commercial Reinsurance Company Limited, General

Security Indemnity Company of Arizona, General Security National Insurance Company, GIE

Columbus, SCOR and SCOR Reinsurance Company (collectively, "Defendants" or the "SCOR

Companies").

**NATURE OF ACTION**

1.     This is a declaratory judgment action brought by Plaintiffs against

Defendants, seeking a declaration concerning the scope of a "Commutation & Release

Agreement" entered into in 2006.

## THE PARTIES

2.      Plaintiff Continental Casualty Company ("CCC") is an insurance company organized under the laws of the State of Illinois, with its principal place of business in Illinois.

3.      Plaintiff Continental Insurance Company ("CIC") is an insurance company organized under the laws of the State of Pennsylvania, with its principal place of business in Illinois.

4.      Defendant Commercial Risk Re-Insurance Company ("CRRC") is an insurance company organized under the laws of Vermont.  On information and belief, its principal place of business is in New York.

5.      Defendant Commercial Risk Reinsurance Company Limited ("CRRC Ltd.") is an insurance company organized under the laws of Bermuda, with its principal place of business in Bermuda.

6.      Defendant General Security Indemnity Company of Arizona ("General Indemnity") is an insurance company organized under the laws of Arizona, with its principal place of business in New York.

7.      Defendant General Security National Insurance Company ("General National") is an insurance company organized under the laws of New York, with its principal place of business in New York.

8.      On information and belief, defendant GIE Columbus is an insurance company organized under the laws of France, with its principal place of business in France.

9.      Defendant SCOR is an insurance company organized under the laws of France, with its principal place of business in France.

10.      Defendant SCOR Reinsurance Company is an insurance company organized under the laws of New York, with its principal place of business in New York.

2

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## BACKGROUND

**Reinsurance**

13.     Under a reinsurance contract, one insurance company, known as the "ceding company" or the "cedent," purchases insurance from another professional insurer, known as the "reinsurer," in order to transfer some or all of the insured risk the cedent has assumed under its direct policies.  In this case, Plaintiffs were the ceding companies and Defendants were the reinsurers.

14.     In reinsurance parlance, a "commutation" is an agreement whereby existing reinsurance contracts are bought back and terminated.  Under the typical commutation agreement, the reinsurer pays the cedent a negotiated amount, in exchange for the cedent's agreement that particular reinsurance contracts are terminated, such that the reinsurer will have no further liability to the cedent under those reinsurance contracts.

**The Commutation Agreement
Negotiated by CNA and the SCOR Companies**

15.     In December 2006, CNA and the SCOR Companies entered into a "Commutation Agreement & Release" (the "Commutation Agreement").  A copy of the Commutation Agreement & Release is attached hereto as Exhibit 1.

3

16.     The Commutation Agreement covered "Reinsurance Agreements," which was defined in part as reinsurance agreements or contracts of reinsurance "between the Parties, *known or unknown*, under which REINSURER assumes losses ceded by CNA to REINSURER…."  (Ex. 1 at 3.)

17.     "Parties" was defined as "CNA and REINSURER, collectively."  (Ex. 1 at 3.)

18.     "CNA" was defined as CCC and CIC and their direct or indirect insurance subsidiaries, excluding certain specfically identified companies.  (Ex. 1 at 2)

19.     "REINSURER" was defined as:

> SCOR Reinsurance Company, General Security National Insurance Company (f/k/a Sorema North America Reinsurance Company); General Security Indemnity Company of Arizona; Commercial Risk Re-Insurance Company, Commercial Risk Reinsurance Company Limited, GIE COLUMBUS, SCOR, Paris, France, including any of its direct or indirect non-life insurance and reinsurance subsidiaries and affiliates, including but not limited to SCOR Global P&C, but excluding Anglo-French Insurance Company, LTD., SAI-SOCIETA ASSICURATRICE INDUSTRIALE, (UK) and any of their subsidiaries.

(Ex. 1 at 3.)

20.     The Commutation Agreement contains a merger and integration clause. Specifically, paragraphs 1 and 3 of Article 7 of the Commutation Agreement provide that:

> This Commutation & Release Agreement shall constitute the final, complete and entire agreement between the parties as respects its subject matter, and supersedes and replaces any prior oral or written understandings of the Parties.  This Commutation & Release Agreement may not be amended except by written amendment executed by each of the Parties.
>
> *        *        *
>
> This Commutation & Release Agreement supersedes any and all other negotiations, discussions, promises, commitments, agreements and understandings, whether oral or written, express or implied, or made

4

before or contemporaneous with the execution of this Commutation & Release Agreement, between the parties with respect to the subject matter[.]   All such negotiations, discussions, promises, commitments, agreements, and understandings are deemed terminated or otherwise extinguished.

(Ex. 1 at 11.)

21.     The Commutation Agreement was executed on behalf of all parties by December 28, 2006.  (Ex. 1 at 15-16.)

**The Allstate Re Contracts and the Unity Fire Contracts**

22.     At various times, CNA purchased reinsurance contracts from Allstate Insurance Company and/or its affiliates (collectively, "Allstate") under which CNA ceded, and Allstate assumed, certain reinsurance business (the "Allstate Re Contracts").

23.     The Allstate Re Contracts were issued by Allstate.

24.     CNA has not agreed to any novation whereby any of the SCOR Companies replaced Allstate under the Allstate Re Contracts.

25.     At various times, CNA purchased reinsurance contracts from Unity Fire and General Insurance Company, now known as Unitrin Preferred Insurance Company ("Unity Fire") under which CNA ceded, and Unity Fire assumed, certain reinsurance business (the "Unity Fire Contracts.")

26.     The Unity Fire Contracts were issued by Unity Fire.

27.     CNA has not agreed to any novation whereby any of the SCOR Companies replaced Unity Fire under the Unity Fire Contracts.

**The Present Dispute**

28.     On its face, the Commutation Agreement does not apply to the Allstate Re Contracts or the Unity Fire Contracts.

29.     The Commutation Agreement is limited to reinsurance contracts under which "REINSURER" assumes losses ceded by "CNA."

30.     The terms "REINSURER" and "CNA" are plain and unambiguous.

31.     Neither Allstate nor Unity Fire falls within the definitions of "REINSURER" or "CNA" under in the Commutation Agreement:

(a)     Neither Allstate nor Unity Fire was a direct or indirect subsidiary or affiliate of the SCOR Companies as of the execution date of the Commutation Agreement.

(b)     Neither Allstate nor Unity Fire was a direct or indirect subsidiary or affiliate of CNA as of the execution date of the Commutation Agreement.

32.     Neither Allstate nor Unity Fire was a signatory to the Commutation Agreement.

33.     Neither Allstate nor Unity Fire was a party to the Commutation Agreement.

34.     Nevertheless, over the past 11 months, the SCOR Companies have claimed to owe certain responsibilities under the Allstate Re Contracts and the Unity Fire Contracts, and assert that those responsibilities were extinguished by the Commutation Agreement.  Specifically, the SCOR Companies claim that the Allstate Re Contracts and the Unity Fire Contracts were terminated by the Commutation Agreement.

35.     As a result, over $1.7 million billed by CNA under the Allstate Re Contracts and/or the Unity Fire Contracts has gone unpaid.

36.     Under Paragraph 8 of the Commutation Agreement, the Parties agreed to submit to the exclusive jurisdiction of the state and federal courts in the State of Illinois any dispute arising under or relating to the Commutation Agreement.  Paragraph 8 also provides that Illinois law shall govern the interpretation and enforcement of the Commutation Agreement.

## COUNT I – DECLARATORY JUDGMENT

37.     CCC and CIC restate and reallege the allegations set forth in Paragraphs 1-36 above, as if set out in full herein.

38.     CCC and CIC contend that the Commutation Agreement does not apply to reinsurance contracts issued by Allstate Re, or by Unity Fire, or by any companies other than those identified as "REINSURER" under the Commutation Agreement.

39.     The SCOR Companies dispute the position of CCC and CIC described in Paragraph 38 above.

40.     Pursuant to 28 U.S.C. § 2201(a), an actual controversy exists between CCC and CIC, on the one hand, and the SCOR Companies, on the other hand, respecting the scope of the Commutation Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

their favor and against Defendants, awarding:

(a)    A declaration that the Commutation Agreement does not apply to reinsurance contracts issued by Allstate, Unity Fire or any companies other than those identified as "REINSURER" under the Commutation Agreement;

(b)    Attorneys' fees and costs; and

(c)    Such other relief as the Court deems just, including any further relief authorized under 28 U.S.C. § 2201(a).


____/ s / Thomas D. Cunningham_____
Thomas D. Cunningham


William M. Sneed
Thomas D. Cunningham
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
312-853-7000

Attorneys for Plaintiffs Continental Casualty
Company and Continental Insurance Company

8

## COMMUTATION & RELEASE AGREEMENT

This Commutation & Release Agreement (hereinafter the "Commutation & Release Agreement") is made by and between CNA (as defined below) and REINSURER (as defined below).

**WHEREAS,** CNA and REINSURER have entered into the Reinsurance Agreements (as defined below);

**WHEREAS,** various disputes have arisen between CNA and REINSURER regarding each of their rights, duties, obligations, and liabilities under and related to the Reinsurance Agreements;

WHEREAS, CNA holds certain Letters of Credit, as listed on Schedule "A" to secure REINSURER's liabilities and obligations under certain of the Reinsurance Agreements (the "Letters of Credit");

WHEREAS, as consideration for CNA entering into certain Reinsurance Agreements with REINSURER, CNA was given certain Letters of Guarantee, including but not limited to Letters of Guarantee dated July 1, 1999 issued for the benefit of REINSURER by SCOR, a French société anonyme ("SCOR") and the ultimate parent company of REINSURER, (the "Guarantees"); and

**WHEREAS,** REINSURER and CNA now desire to fully and finally settle and commute all of their respective rights, duties, obligations, and liabilities arising under or relating to the Reinsurance Agreements, and to fully and forever release and discharge one another with respect to all outstanding obligations arising under or relating to the Reinsurance Agreements.

**NOW, THEREFORE,** in consideration of the promises, covenants, agreements, conditions, payments, and other good and valuable consideration set forth herein, it is agreed by and between CNA and REINSURER as follows:

EXHIBIT

1

## ARTICLE 1. DEFINITIONS:

As used in this Commutation & Release Agreement, the following terms shall have the following meanings:

a.  "CNA"- as used throughout this Agreement shall mean Continental Casualty Company and Continental Insurance Company and their direct or indirect insurance subsidiaries and affiliates of as of the effective date of this Commutation & Release Agreement, , excluding (i) Continental Assurance Company, CNA Group Life Assurance Company and any other life insurance company, (ii) First Insurance Company of Hawaii, Ltd and (ii) insurance subsidiaries of CNA Surety Corporation, and any successor or predecessor of the foregoing excluded companies listed in (i) through (iii) including but not limited to Western Surety Company, Surety Bonding Company of America and Universal Surety of America. CNA shall include Continental Casualty Company's authority as attorney in fact for its former subsidiary Continental National Indemnity Company for reinsurance effective prior to its sale on December 30, 2005

b.  "Collateral" shall mean any Letters of Credit and any other funds being held by CNA and established for the benefit of CNA in connection with the Reinsurance Agreements, excluding the Funds Withheld Account, as defined in Article 1.d. below.

c.  "Effective Date" means 12:02 A.M. EST October 1, 2006.

d.  "Funds Withheld Account" shall mean the Funds Withheld Accounts and the Reserve Accounts established by CNA in accordance with the terms of the reinsurance agreements (a) through (f) listed on Schedule B.

2

"Party" means CNA or REINSURER, individually, as the context of the Commutation & Release Agreement requires, and "Parties" means CNA and REINSURER, collectively.

f.  "Reinsurance Pool" means a group or association of reinsurers that, as a group or association, collectively underwrites agreed types of risk, and whose members each share premiums, losses, and expenses and each agree to accept a certain portion of all risks collectively underwritten on behalf of such group or association.

g.  "Reinsurance Agreement" means any reinsurance agreement or any contract of reinsurance between the Parties, *known or unknown,* under which REINSURER assumes losses ceded by CNA to REINSURER; provided that "Reinsurance Agreement" does not include (1) solely that portion of any liability of REINSURER under any contract of reinsurance where such portion of liability of REINSURER is as a participating pool member of a Reinsurance Pool such as: (i) the Excess & Casualty Reinsurance Association; (ii) the American Companies Group underwritten and managed by IAGM Corporation; (iii) Agency Managers; or (iv) EXKO Inter-Pool; and/or (2) any reinsurance agreements solely covering (i) life insurance business and/or (ii) surety and credit business.

h.  "REINSURER" means SCOR Reinsurance Company, General Security National Insurance Company (f/k /a Sorema North America Reinsurance Company); General Security Indemnity Company of Arizona; Commercial Risk Re-Insurance Company, Commercial Risk Reinsurance Company Limited, GIE COLUMBUS, SCOR, Paris, France, including any of its direct or indirect non-life insurance and reinsurance subsidiaries and affiliates, including but not limited to SCOR Global P&C, but excluding Anglo-French Insurance Company, LTD., SAI - SOCIETA ASSICURATRICE INDUSTRIALE, (UK) and any of their subsidiaries.

"Settlement Amount" means the cash amount equal to US$40,500,000 less the amounts set forth in Article 2, paragraph 1, subparagraph (ii)(x) and (y) below.

"Settlement Date" means December 29, 2006.

## ARTICLE 2. COMMUTATION SETTLEMENT:

As consideration for the CNA entering into this Commutation & Release Agreement, Reinsurer shall:

(i)    irrevocably and unconditionally release to CNA the balance of the Funds Withheld Account as of the Effective Date; and

(ii)    on the Settlement Date, pay to CNA cash in the amount of US$27,344,217.44 being the sum of US$40,500,000.00, less (x) the amount of any funds withdrawn from or draw downs to be made on the Collateral by CNA since October 1, 2006 through the Settlement Date and less (y) $1,057,175.00.

Amounts payable in cash  to CNA on the Settlement Date  shall be paid in United States currency, by wire transfer to CNA's account as follows:

| | |
|---|---|
| Bank | JP Morgan Chase |
| City/State | New York, NY |
| ABA | 021000021 |
| Account Name | No Amer Ins FBO CNA Ins |
| Account No | 323512968 |
| OBI | FFC G07400 |
| | RE: Ceded Re  – Glenn Rzeszutko |

unless CNA in writing specifically instructs REINSURER otherwise.

For the avoidance of doubt, the Parties agree that any payments by REINSURER to REINSURED sent to an intermediary prior to the Settlement Date in connection with the Reinsurance Agreements will be paid to REINSURED

4

2.    It is understood and agreed by the Parties that no further payment by or between the Parties shall be made with respect to the matters released by this Commutation & Release Agreement, and that CNA accepts the Settlement Amount as full and final settlement of any and all amounts claimed heretofore or hereafter to be due by or between the Parties arising under or relating to the Reinsurance Agreements.  The Parties, however, do not release any claim arising out of any violation or breach of this Commutation & Release Agreement.

## ARTICLE 3. RELEASE AND ASSIGNMENT:

Upon execution of this Commutation & Release Agreement and confirmation of receipt of the Settlement Amount funds to CNA's account, CNA, on behalf of itself, its parents, affiliates, subsidiaries, predecessors, successors, and assigns, and the officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, representatives, owners, and partners of itself and its parents, affiliates, subsidiaries, predecessors, successors, and assigns, hereby irrevocably and unconditionally releases, acquits, and forever discharges REINSURER, its parents, affiliates, subsidiaries, predecessors, successors, and assigns, and the officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, representatives, owners, and partners of REINSURER and its parents, affiliates, subsidiaries, predecessors, successors, and assigns, from any and all liabilities, obligations, rights, adjustments, executions, offsets, actions, causes of action, suits, counts, arbitrations, mediations, debts, sums of money, amounts, bonds, billings, disbursements, covenants, contracts, controversies, agreements, promises, damages, judgments, claims, demands, duties, omissions, costs, fees, expenses, losses, and injuries of any kind, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, reported or unreported, claimed or unclaimed, matured or unmatured, fixed or contingent, at law or in equity, whether alleged to arise under contract or tort, or statutory, regulatory, or common law, arising under or relating to the Reinsurance Agreements and the Guarantees, including but not limited to any and all fraud, misrepresentation, and bad faith claims arising under or relating to the Reinsurance Agreements and the Guarantees.  Without limiting the generalities of the foregoing, it is the intention of CNA that this release operates as a full

5.



and final release and discharge of REINSURER from any and all duties, obligations, and liabilities arising under or relating to the Reinsurance Agreements and the Guarantees. CNA, however, does not release any claim arising out of any violation or breach of this Commutation & Release Agreement.

2. Upon execution of this Commutation & Release Agreement and confirmation of receipt of the Settlement Amount funds to CNA's account, REINSURER, on behalf of itself, its parents, affiliates, subsidiaries, predecessors, successors, and assigns, and the officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, representatives, owners, and partners of itself and its parents, affiliates, subsidiaries, predecessors, successors, and assigns, hereby irrevocably and unconditionally releases, acquits, and forever discharges CNA, its parents, affiliates, subsidiaries, predecessors, successors, and assigns, and the officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, representatives, owners, and partners of CNA and its parents, affiliates, subsidiaries, predecessors, successors, and assigns, from any and all liabilities, obligations, rights, adjustments, executions, offsets, actions, causes of action, suits, counts, arbitrations, mediations, debts, sums of money, amounts, bonds, billings, disbursements, covenants, contracts, controversies, agreements, promises, damages, judgments, claims, demands, duties, omissions, costs, fees, expenses, losses, and injuries of any kind, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, reported or unreported, claimed or unclaimed, matured or unmatured, fixed or contingent, at law or in equity, whether alleged to arise under contract or tort, or statutory, regulatory, or common law, arising under or relating to the Reinsurance Agreements and the Guarantees, including but not limited to any and all fraud, misrepresentation, and bad faith claims arising under or relating to the Reinsurance Agreements and the Guarantees. Without limiting the generalities of the foregoing, it is the intention of REINSURER that this release operates as a full and final release and discharge of CNA from any and all duties, obligations, and liabilities arising under or relating to the Reinsurance Agreements and the Guarantees. REINSURER, however, does not release any claim arising out of any violation or breach of this Commutation & Release Agreement.

6



3.    Each Party acknowledges that statutory, regulatory, or common law may limit the waiver or release of unknown or unsuspected claims. Without accepting that such statutory, regulatory or common law applies to this Commutation & Release Agreement, each Party hereby waives and releases any and all rights it might have pursuant to any such statutory, regulatory, or common law in connection with the subject matter of this Commutation & Release Agreement.

4.    The Parties hereby agree that this Commutation & Release Agreement is final and binding and cannot be voided or opened by either Party for any reason, including but not limited to the discovery of facts, circumstances, mistake of law or legal decisions, subsequent or otherwise, different from or in addition to those now known or believed to be true regarding the subject matter of this Commutation & Release Agreement.

## ARTICLE 4. TERMINATION OF PROCEEDINGS:

Each Party covenants and agrees not to commence or continue any proceeding (including but not limited to any lawsuit or arbitration) against any other Party to this Commutation & Release Agreement by reason of any liability, obligation, right, adjustment, execution, offset, action, cause of action, suit, count, debt, sum of money, amount, bond, billing, disbursement, covenant, contract, controversy, agreement, promise, damage, judgment, claim, demand, duty, omission, cost, fee, expense, loss, or injury solely arising under or relating to any Reinsurance Agreement.

2.    Accordingly, any and all arbitration or other proceedings currently instituted or pending between the Parties that has as its subject matter any dispute solely arising under or relating to any Reinsurance Agreement is hereby resolved as between them, and the Parties shall cooperate with each other in taking all appropriate steps to terminate or dismiss or cause to be dismissed with prejudice such arbitration or proceeding within ten (10) business days of the Effective Date, including but not limited to the matters set forth in (i) through (iv) following;: (i) that action pending in the U.S. District Court for the District of Connecticut,

captioned, <u>Commercial Risk Re-Insurance Company v. Continental Casualty Company</u>, No. 3:06-CV-00077, (ii) that action pending in the U.S. District Court for the Northern District of Illinois, captioned <u>Commercial Risk Re-Insurance Company v. Continental Casualty Company</u>, No. 06 C 0262, (iii) the arbitration pending in Chicago, Illinois between Continental Casualty Company and Commercial Risk Re-Insurance Company before Richard S. Bakka, Klaus H. Kunze and Richard G. Waterman; and (iv) the arbitration pending in Chicago, Illinois between Continental Casualty Company and American Casualty Company and Commercial Risk Re-Insurance Company related to two reinsurance contracts, Coca Cola Bottling Company of New York - contract year 2000 and Vertis Inc contract year 2001

3.     Each Party shall bear its own legal fees, expenses and costs with respect to any such arbitration or other proceeding, including but not limited to any cost of any appointed arbitrator.

## ARTICLE 5. INDEMNIFICATION:

1     CNA shall indemnify and hold harmless REINSURER in respect of any claim made by a person or entity that is or claims to be a reinsured under any Reinsurance Agreement, or purports to hold the claim of a reinsured by assignment or otherwise. REINSURER shall indemnify and hold harmless CNA in respect of any claim made by a person or entity that is or claims to be a retrocessionaire of REINSURER under any retrocession agreement reinsuring any Reinsurance Agreement and where such person or entity is contesting an obligation to pay REINSURER under such retrocession agreement.

## ARTICLE 6. REPRESENTATIONS AND WARRANTIES:

Each Party represents, warrants, and agrees that:

a.     Any judicial, statutory, regulatory, administrative, corporate, ministerial, or other action necessary for the execution, delivery, or performance of any promise, covenant,

8

agreement, condition, payment, or consideration of or under this Commutation & Release Agreement by such Party has been taken, including but not limited to the execution of any documents necessary to effectuate any promise, covenant, agreement, condition, payment, or consideration of or under this Commutation & Release Agreement; each Party further represents, warrants, and agrees that it shall, from time to time, upon the reasonable request of the other Party, execute and deliver any further documents that may be required to fully implement the intent of this Commutation & Release Agreement.

b.    No further action, consent, or approval of any person, entity, court, arbitration panel, or governmental or regulatory body is required for the execution, delivery, or performance of any promise, covenant, agreement, condition, payment, or consideration of or under this Commutation & Release Agreement by such Party;

c.    No promise, covenant, agreement, condition, payment, or consideration of or under this Commutation & Release Agreement by such Party violates any law or conflicts with any order, writ, injunction, judgment, award, or decree of any court, arbitration panel, or governmental or regulatory body;

d.    No promise, covenant, agreement, condition, payment, or consideration of or under this Commutation & Release Agreement by such Party violates any article of incorporation or by-law of such Party;

e.    Any person executing this Commutation & Release Agreement on behalf of such Party has the necessary, appropriate, and legal right, power, and authority to do so;

f    It is not a party to any agreement, transaction, or negotiation that would render this Commutation & Release Agreement, or any part thereof, void, voidable, or unenforceable;

9

g.    It has not assigned, sold, or transferred any claim or right intended to be discharged or released by or under this Commutation & Release Agreement;

h.    It is not aware of any third party that has, or might assert, some interest in any claim or right intended to be discharged or released by or under this Commutation & Release Agreement;

It has completely read, fully understands, and freely and voluntarily accepts the terms and conditions of this Commutation & Release Agreement;

j     Each statement, warranty and representation made by such Party in this Commutation & Release Agreement is true and accurate;

k.    It is not, and does not have any reason to believe it is, insolvent;

It is not under any regulatory or judicial supervision, order or other limitation;

m.    This transaction is in its best interests.

## ARTICLE 7. OTHER:

This Commutation & Release Agreement shall constitute the final, complete and entire agreement between the parties as respects its subject matter, and supersedes and replaces any prior oral or written understandings of the Parties. This Commutation & Release Agreement may not be amended except by written amendment executed by each of the Parties.

2.    Each Party acknowledges and agrees that this Commutation & Release Agreement is the product of arm's length negotiations, that each party was represented by legal counsel of its choice, and that this Commutation & Release Agreement is made solely for the consideration described herein. The Parties acknowledge and agree that this Commutation

& Release Agreement is not a contract of uberrimae fidei (utmost good faith). Each Party acknowledges and agrees that it has not relied upon any statement, warranty, or representation of the other Party, other than those statements, warranties, and representations expressly made in this Commutation & Release Agreement. In the event of a future dispute, the Parties shall be considered joint authors of this Commutation & Release Agreement, and no wording shall be interpreted against either party because of authorship.

3.     This Commutation & Release Agreement supersedes any and all other negotiations, discussions, promises, commitments, agreements, and understandings, whether oral or written, express or implied, or made before or contemporaneous with the execution of this Commutation & Release Agreement, between the Parties with respect to the subject matter
        All such negotiations, discussions, promises, commitments, agreements, and understandings are deemed terminated or otherwise extinguished.

4.     Except as otherwise provided in this Article, the Parties, including but not limited to their attorneys, agents, representatives, and affiliates, acknowledge and agree that this Commutation & Release Agreement, all terms and conditions thereof, and all matters relating to the negotiations of this Commutation & Release Agreement are and shall remain confidential. The Parties shall not publicize or disclose in any manner this Commutation & Release Agreement, any term or condition thereof, or any matter relating to the negotiations of this Commutation & Release Agreement, whether in writing or orally or directly or indirectly, to any person or entity; provided that each Party may disclose this Commutation & Release Agreement and its terms, as necessary or required and without further agreement of the other Party, to its respective employees (on a need to know basis), attorneys, actuaries, external auditors, accountants, regulators and other governmental authorities, and retrocessionaires.

5.     If any third party (other than those identified and described in paragraph 4 of this Article) seeks disclosure of this Commutation & Release Agreement or its terms through subpoena, discovery request, or other request, where reasonably possible, the Party from whom any

such disclosure is being sought shall advise the other Party of such request or demand within a reasonable time before compliance therewith is requested or demanded, so that the other Party has reasonable opportunity to resist such disclosure by timely and appropriate process.

6.    Nothing in this Article shall be construed to preclude the Parties from providing notice of this Commutation & Release Agreement to any reinsurance intermediary of any Reinsurance Agreement; provided that any such disclosure to any such intermediary shall be limited to the fact that a compromise settlement and commutation has been completed.

7.    This Commutation & Release Agreement and its terms may be disclosed by any Party in any proceeding against the other Party to enforce the terms of this Commutation & Release Agreement.

8.    This Commutation & Release Agreement shall be interpreted, construed, enforced, and otherwise governed by and in accordance with the laws of the State of Illinois, and the Parties hereby agree to submit to the exclusive jurisdiction of the state and federal courts in the State of Illinois, including consent to service of process, with respect to any dispute arising under or relating to this Commutation & Release Agreement.    Reinsurer hereby agrees that service of process in such suit against it may be made upon Maxine H. Verne, General Counsel, SCOR Reinsurance Company 199 Water Street, 21st Floor, New York, NY 10038,   and hereby designates her as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of CNA arising out of this Commutation & Release Agreement, and hereby designates above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof. The parties hereby agree that nothing in this Commutation & Release Agreement shall restrict the right to effect service of process in any other manner permitted by the laws of the State of Illinois.

9.    This Commutation & Release Agreement and its terms and conditions shall be binding

12

upon and shall inure to the benefit of the Parties and their respective predecessors, successors and assigns. This Commutation & Release Agreement is not intended to confer any right or benefit upon any person or entity other than the foregoing.

10. The failure of any Party to enforce at any time any of the provisions of this Commutation & Release Agreement shall in no way be construed to be a waiver of such provision, nor in any way to affect the validity of this Commutation & Release Agreement, or any part hereof, or the rights of such Party to thereafter enforce such provision.

11 Each of the provisions of this Commutation & Release Agreement shall be deemed severable in that if any provision of this Commutation & Release Agreement is deemed or becomes null and void or unenforceable for any reason, the remaining provisions of this Commutation & Release Agreement shall remain in full force and effect to the extent permitted by law. However, if any court, arbitration panel, or governmental or regulatory body renders an order, ruling, or other determination declaring that this Commutation & Release Agreement or Article 2 or Article 3, paragraphs 1 through 3 of this Agreement is null and void or unenforceable, the Parties acknowledge and agree that each Party shall be restored to the position it was in just prior to entering into this Commutation & Release Agreement.

12. Any notice, communication, or other contact with respect to this Commutation & Release Agreement shall be in writing, signed by the Party, and sent via courier, such as Federal Express, or via facsimile transmission with electronic confirmation to:

> **CNA:**
> Reinsurance Operations
> CNA Center    Floor 23
> 333 S. Wabash
> Chicago, Illinois 60604
> Attention:  Senior Vice President
> Facsimile:  312-817-1225

13

REINSURER:

SCOR Reinsurance Company

199 Water Street, 21st floor

New York, NY 10038

Attention: Maxine H. Verne, SVP & General Counsel

Facsimile: 212 480-1329

Either Party may change its notification information upon ten (10) day advance written notice to the other Party.

13. Any schedule referenced in and attached to this Commutation & Release Agreement is a part hereof and is incorporated herein by reference.

14. The Parties acknowledge and agree that this Commutation & Release Agreement reflects a compromise in settlement of disputed rights, duties, obligations, and liabilities arising under and relating to the Reinsurance Agreements, and neither the existence of this Commutation & Release Agreement nor any of its provisions constitutes an admission or waiver by either Party or a retraction of any position on the part of either Party. The Parties intend that this Commutation & Release Agreement and its provisions be afforded the protections of Rule 408 of the Federal Rules of Evidence and any similar state rule or law that protects agreements of settlement or compromise from being used as evidence of admission, waiver, or retraction of any right or position on the part of any Party. Furthermore, except only in connection with a proceeding to enforce any of its provisions as between the Parties, neither this Commutation & Release Agreement nor any of its terms shall be admissible in any other proceeding.

15 This Commutation & Release Agreement may be executed and delivered in multiple counterparts, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute but one and the same instrument and agreement. A

14

facsimile or electronic copy of a signature shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Commutation & Release Agreement, in duplicate, by their respective authorized officers.

**CONTINENTAL CASUALTY COMPANY on behalf of itself and its direct and indirect subsidiaries and affiliates, as of the Effective Date**

BY: _____        ATTEST _____

NAME: Peter Lies

TITLE: Senior Vice President

DATE: December 2l 2006

Appr
Law [
By: _____
Date: 12 - 21 -06

**THE CONTINENTAL INSURANCE COMPANY on behalf of itself and its direct and indirect subsidiaries and affiliates, as of the Effective Date**

BY: _____        ATTEST _____

NAME: Peter Lies

TITLE: Senior Vice President

DATE: December 2l, 2006

**SCOR REINSURANCE COMPANY**

**GENERAL SECURITY NATIONAL INSURANCE COMPANY and**

**GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA**

_____

NAME:

TITLE:

DATE:

15

**SCOR, on behalf of itself and its non-life subsidiaries**

**SCOR GLOBAL P&C**

**GIE COLUMBUS**

NAME:   Pierre CHARLES

TITLE:   Exc. Vice President.

DATE:  December 21 , 2006


**COMMERCIAL RISK REINSURANCE COMPANY LIMITED and**

**COMMERCIAL RISK RE-INSURANCE COMPANY**

NAME:   Pierre CHARLES

TITLE:   President

DATE:  December 21 ,.2006

16

# SCHEDULE A

| | LOC DRAW | | | | | | |
|---|---|---|---|---|---|---|---|
| Beneficiary name | Amount | Maturity Date | Company | Facility | Bank | LOC # | Bank reference |
| Columbia Casualty Corporation | $3,080,319.00 | December 31, 2006 | Bermuda | CITI | Citibank | 160004 | |
| Continental Casualty Corporation | $2,659,244.00 | May 31, 2006 | Bermuda | CITI | Citibank | 160217 | |
| Continental Casualty Corporation | $6,177.00 | June 30, 2006 | Bermuda | CITI | Citibank | 160219 | |
| Continental Casualty Corporation | $1,381,741.00 | May 31, 2007 | Bermuda | CITI | Barclays | 140020 | |
| Columbia Casualty Company | $300,000.00 | | SCOR Paris | | BNP NY | LOC0265 | 91867983 |
| Continental Insurance Company | $348,905.15 | | SCOR Italia | | Banca Intesa | | 900007/1566 |
| Continental Insurance Company | $697,956.49 | | SCOR Paris | | BNP NY | LOC0525 | 91867981 |
| Continental Re | $10,710.93 | | SCOR Paris other than 745 | | BNP NY | | 91867980 |

$8,485,053.57

## SCHEDULE B

a)  Risk Management Reinsurance Program for CNA's Alternative Financial Products' Large SIR Workers' Compensation Business (April 1, 1999 – December 31, 1999)

b)  Risk Management Reinsurance Program for CNA's Alternative Financial Products' Large SIR Workers' Compensation Business (January 1, 2000 – December 31, 2000)

c)  Risk Management Reinsurance Program for CNA's Alternative Financial Products' Large SIR Workers' Compensation Business (January 1, 2001 – December 31, 2001)

d)  Risk Management Reinsurance Program for CNA's Alternative Financial Products' Large SIR Workers' Compensation Business (January 1, 2002 – December 31, 2002)

e)  Risk Management Reinsurance Program for CNA's Alternative Financial Products' (January 1, 2000 – December 31, 2000)

f)  Risk Management Reinsurance Program for CNA's Alternative Financial Products (January 1, 2001 – December 31, 2001